UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ERNIE RIZZO, | ) | No. 04 B 24507 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| EARL MERRITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 A 3755 |
| | ) | |
| ERNIE RIZZO, | ) | |
| | ) | |
| Defendant. | ) | Judge Goldgar |

## MEMORANDUM OPINION

In 2002, debtor Ernie Rizzo held a judgment against Denny Passialis and was attempting to collect it. Believing that Earl Merritt, Passialis's uncle, was using his bank account to hide money for Passialis, Rizzo tried to serve Merritt with a non-wage garnishment at Merritt's workplace – which happened to be a state correctional facility. In the process, Rizzo spoke with one of Merritt's superiors by phone. Asked why he wanted to serve Merritt, Rizzo said that Merritt was involved in a "money-laundering" scheme. Merritt subsequently sued Rizzo for defamation in Illinois state court and won, obtaining a $20,000 judgment in April 2004. Two months later, Rizzo sought protection under chapter 7 of the Bankruptcy Code.

Merritt then filed a single-count adversary complaint against Rizzo in the bankruptcy, alleging that the defamation judgment against Rizzo was non-dischargeable under section 523(a)(6) of the Code as a debt "for willful and malicious injury by the debtor to another." 11

U.S.C. § 523(a)(6). In January 2005, Merritt moved for summary judgment on his complaint, basing his motion on what he contended was the collateral estoppel effect of the state court judgment. In a July 2005 oral ruling, this court denied the motion on two grounds: first, Merritt had neglected to prove the judgment was final, a critical prerequisite for collateral estoppel; and second, even if the judgment had been final, the state court's findings did not establish a "willful and malicious injury."

Although summary judgment was denied, the court entered an order pursuant to Rule 56(d), Fed. R. Civ. P. 56(d) (made applicable by Fed. R. Bankr. P. 7056), making findings of undisputed fact that would govern at trial. These included the following: that Rizzo stated to one of Merritt's superiors that Merritt was involved in a money-laundering scheme, that the statement was false, and that Merritt suffered both psychological harm and harm to his reputation as a result of the statement. The Rule 56(d) findings left a single issue for trial: whether Rizzo's statement was "willful and malicious" for purposes of section 523(a)(6).

The matter was tried in October 2005. Only two witnesses, Merritt and Rizzo, testified. Based on the evidence, the court concludes that Rizzo's statement was neither "malicious" nor "willful." Judgment will therefore be entered in favor of Rizzo.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(I). The court may therefore enter a final judgment. *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988).

## 2. Findings of Fact

Ernie Rizzo is a licensed private investigator who has done business under his own name and as the "Illinois Bureau of Investigation." (Order dated July 8, 2005; Tr. at 10-11).[1] Calling himself "semi-retired," Rizzo now maintains a single office in Antioch, Illinois. (Tr. at 10-11, 39). Previously, Rizzo had an additional office in Addison, Illinois. (*Id.* at 11). The Addison office was next door to the home of Denny Passialis. (*Id.* at 12, 31).

Passialis is no boy scout. According to Rizzo (whose testimony on this point was unopposed), Passialis is a "crack addict" (Tr. at 35) who was dealing drugs and running a prostitution ring out of his Addison home (*id.* at 32-35, 56). Rizzo asserted that Passialis had been the subject of criminal investigations by any number of state and federal law enforcement agencies (*id.* at 33-34) and had been arrested repeatedly (*id.* at 34, 56).

Relations between Rizzo and Passialis were plainly poor. Passialis seems to have thought that Rizzo was spying on him – shining lights on his house, pointing surveillance cameras at his property, and making recordings of his activities. (*See* Tr. at 31-33). Passialis may also have publicized these beliefs, because in 2001 Rizzo filed a defamation action against Passialis in Illinois state court. (*Id.* at 12). In late December 2001, Rizzo obtained a default judgment for $25,000 against Passialis in the action.[2] (*Id.* at 12-13, 48; *see* D. Ex. 1). The judgment was

---

[1] The trial transcript is cited in this opinion as "Tr. ___." Merritt's exhibits and Rizzo's exhibits are cited respectively as "P. Ex. ___" and "D. Ex. ___." The court's order making Rule 56(d) findings is cited as "Order dated July 8, 2005."

[2] At least one defamation action Rizzo brought against Passialis is described in *Rizzo v. Passialis (In re Passialis)*, 292 B.R. 346, 351 (Bankr. N.D. Ill. 2003). It is unclear whether the action detailed in the *Rizzo v. Passialis* opinion was the action that resulted in the default judgment or a subsequent action (*see* Tr. at 28, 30), but the opinion reveals more about the nature of the continuing conflict between Rizzo and Passialis.

ultimately vacated in May 2002 (Tr. at 12-13), but not before Rizzo began took steps to enforce it – steps that precipitated the current dispute.

Rizzo began his collection efforts by asking Passialis how he intended to pay the judgment. (Tr. at 49). Passialis retorted that he was "on welfare," claimed he had only "$15 in his checking account," and dared Rizzo to "try and collect it." (*Id.* at 50). Rizzo investigated Passialis's assertions and found them to be true. (*Id.*). Looking into Passialis's affairs further, however, Rizzo discovered that in February 2001, some ten months earlier, Passialis had settled a civil rights action against the Village of Stone Park, Illinois. (*Id.* at 50-52). As his part of the settlement, Passialis had been given a check for $48,450. (*Id.* at 51-52; *see* D. Exs. 2-3).

Rizzo promptly set about tracking down the check. Somehow – it was never explained how – he learned that the check had been turned over to Passialis's aunt, Joanne Koklas, who had deposited it in a joint checking account she maintained at Bank One with her husband, Earl Merritt. (Tr. at 53-54; *see* D. Ex. 3). According to Rizzo (and on this point, too, his testimony was unopposed), the account was set up specially for the $48,450 check and was separate from another joint Bank One account that Koklas and Merritt maintained. (Tr. at 60-61, 79). From the new account, Koklas used the $48,450 to pay Passialis's bills, including legal bills from defense lawyers representing "Passialis and the girls" in drug and prostitution cases.[3] (*Id.* at 56-

---

[3] Rizzo testified that "they" – both Koklas and Merritt -- deposited the $48,450 check into the special Bank One account and then paid Passialis's bills. (*See, e.g.,* Tr. at 54, 56). But Rizzo's own exhibits fail to bear this out. As Rizzo ultimately conceded (*see id.* at 80-81, 92), Koklas alone endorsed the settlement check (*see* D. Ex. 3), and Koklas alone signed the checks written on the Bank One account (*see* D. Ex. 6). Merritt denied writing any checks on the account (Tr. at 85, 91), denied having any involvement with the deposit of Passialis's funds into a bank account bearing his name (*id.* at 85), denied using any funds from his bank account to pay Passialis's bills (*id.*), and denied seeing the $48,450 check at all until it was produced in his own defamation action against Rizzo (*id.* at 93). Rizzo's bald assertions to the contrary are the only evidence of Merritt's involvement with the check, the account, and the payments.

57, 61-62, 78-79; *see* D. Ex. 6).

In an attempt to freeze the funds in the new account, Rizzo tried to serve Koklas and Merritt in January with non-wage garnishments. (Tr. at 15, 55-56, 63). Service, though, proved problematic. According to Rizzo, he and a process server went to the Merritt residence to serve the garnishment papers, but Merritt and Koklas "wouldn't come out." (*Id.* at 75). Eventually, Koklas answered the door, and Rizzo "handed her the paperwork."[4] (*Id.* at 15, 63, 75). Rizzo then asked for Merritt, but Merritt did not appear. (*Id.* at 63). Koklas reportedly told Rizzo, "[y]ou don't know who you're messing with," and slammed the door. (*Id.* at 63-64). Rizzo claims to have tried to serve Merritt for a week without success: "[h]e wouldn't open the door," Rizzo said. (*Id.* at 65). Merritt denied having refused service at his home. (*Id.* at 89).

Unable to serve Merritt at home for whatever reason, Rizzo next tried to serve him at work. But serving Merritt with a non-wage garnishment at work was also no easy task. Merritt was and still is an official with the Illinois Department of Corrections, holding the working rank of major. (Tr. at 84). He has worked for IDOC for 17 years. (*Id.*). In 2002, Merritt was employed at the Illinois Youth Center-Valley View in St. Charles, a medium-security facility for juvenile offenders, where he served as Public Service Administrator and Chief of Security. (*Id.* at 89; Order dated July 8, 2005).

On March 27 or 28, 2002, Rizzo telephoned Merritt at Valley View and told him he wanted to serve him with, as Merritt put it, "some type of subpoena."[5] (Tr. at 66, 86-87).

---

[4]  The next day, Koklas sent Rizzo a copy of the required "answers to interrogatories by garnishee" in which she denied having possession, custody, or control of any property belonging to Passialis and denied being indebted to Passialis. (D. Ex. 4).

[5]  Merritt testified only that he got the call from Rizzo sometime in 2002. However, Rizzo testified that he telephoned Merritt's superior the same day he spoke to Merritt (Tr. at 66),

-5-

Merritt explained to Rizzo that "he couldn't just drive up to the gate, walk in, and serve it." (*Id.* at 87). Merritt told Rizzo that the facility had a procedure for such things, one that required Merritt to report Rizzo's request to IDOC's legal department as well as to his superiors. (*Id.* at 87-88). Rizzo would then be contacted about how he could accomplish service. (*Id.* at 88). Rizzo, though, "wanted it done immediately," Merritt testified. (*Id.* at 87). Merritt told Rizzo that if he wanted to serve him, he was welcome to go through Merritt's attorney.[6/] (*Id.*).

Unsatisfied with Merritt's answer, Rizzo called Valley View again and asked what the procedure was for serving an employee "with a subpoena." (Tr. at 66). This time, he was connected to a woman who identified herself as "Cindy Williams" (Order dated July 8, 2005) and asked who the "subpoena" was for (*id.*). Rizzo answered that it was for Earl Merritt. (Tr. at 67). Williams then asked: "Why are you serving him and what's this about?" (*Id.* at 82; *see also id.* at 66). Rizzo replied that Merritt was a participant in a money-laundering scheme with his nephew (Order dated July 8, 2005) and that Rizzo had a non-wage garnishment to serve on him (Tr. at 67). "He refuses to be served at home," Rizzo added, "and he claims it's illegal to be served on state property." (*Id.* at 82; *see also id.* at 67). Williams thanked him, said she would speak to Merritt, and hung up. (*Id.* at 67).

Williams, it turned out, was one of Merritt's superiors at Valley View (Order dated July

---

and that call, it was previously established, was placed on March 27 or 28, 2002 (Order dated July 8, 2005).

[6/]    Rizzo recalled the conversation differently. Rizzo said he told Merritt that he had a process server outside, that he understood "it's a prison, so the man certainly can't walk in," that he did not want to cause Merritt any embarrassment, and that he would appreciate it if Merritt would simply meet the process server in the parking lot. (Tr. at 65). To this, Merritt declared that he was a state employee, that no one could come in, and that it was "illegal to serve him," whereupon he hung up. (*Id.* at 66). Of the two accounts, Merritt's version of his response to Rizzo's call is the more plausible.

8, 2005), perhaps the warden or an assistant warden (*see* P. Exs. 1, 3; Tr. at 15). It is unclear whether Rizzo knew at the time of the telephone conversation that Williams was Merritt's superior. Williams identified herself by name (Order dated July 8, 2005), but there is no evidence she identified her position.[2/]

Rizzo's accusation of money-laundering by Merritt was false. (Order dated July 8, 2005). In fact, Rizzo had no basis for claiming that either Merritt or Passialis was involved in money-laundering. Under both federal and Illinois law, money-laundering means a transaction designed to hide the source, location, nature, ownership or control of money or property derived from an *unlawful* source. *See United States v. Esterman*, 324 F.3d 565, 569 (7th Cir. 2003); *People v. Fields*, 339 Ill. App. 3d 689, 697, 791 N.E.2d 686, 693 (2nd Dist. 2003). The source of the $48,450 check that attracted Rizzo's attention, however, was perfectly lawful: it came from the settlement of a lawsuit. (Tr. at 51-52; D. Exs. 2-3). Rizzo admitted that the check's source was lawful. (Tr. at 78).

In May 2002, Merritt filed an action against Rizzo in Illinois state court, alleging that in accusing him of "money-laundering" during the telephone conversation Rizzo had defamed him. (P. Ex. 3). On April 8, 2004, following a bench trial, the state court entered judgment in Merritt's favor. (*See* P. Ex. 4). Among other things, the state court found that Rizzo's statement about Merritt's involvement in a money-laundering scheme was false. (*Id.*; Order dated July 8, 2005). The state court also found that the statement constituted defamation *per se*, was not privileged, and was made with reckless disregard for its truth or falsity. (P. Ex. 4). Based on

---

[2/] If he did not know Williams's position at the time, though, Rizzo must have found out soon enough. Two weeks after the phone call, Rizzo wrote a letter of complaint about Merritt to "Warden Cindy Williams." (P. Ex. 1). The letter repeated the allegation that Merritt was engaged in "a 'money-laundering' scheme with career criminals." (*Id.*).

-7-

these findings, Merritt was awarded $10,000 in actual damages and $10,000 in punitive damages. (*Id.*). Rizzo appealed the judgment (P. Ex. 5), but the appeal was dismissed (P. Ex. 6).

Entry of the defamation judgment only exacerbated the difficulties between the two men. In June 2004, Rizzo wrote Merritt a letter (this in response to a letter Merritt had written him) in which Rizzo claimed to be judgment-proof and declared that "[f]or the next ten years or so, I will be only investigating the Passialis family and their criminal activities." (P. Ex. 7). Three days later, Rizzo sent a letter to Merritt's lawyer making these same statements. (P. Ex. 8). Six days after that, Rizzo sent Merritt another letter railing against Passialis's involvement with "drugs, prostitution, welfare fraud, bankruptcy fraud, [and] credit fraud," involvement of which Merritt was "well aware." (P. Ex. 9).

On June 30, 2004, Rizzo filed his chapter 7 petition, but still the squabbling continued. In December 2004, Rizzo complained to the Lake County Sheriff's Department about "possible extortion." (P. Ex. 11 at 3; *see also* Tr. at 42). According to the report of the detective who took the complaint, Rizzo said that he had received three letters from Merritt declaring that if Rizzo did not pay what he owed Merritt, it was possible his bankruptcy case would "become public," including "photos." (P. Ex. 11 at 3). Rizzo produced only one of the three letters he claimed had been sent, and the detective concluded that the contents of the letter produced gave "no indication of extortion." (*Id.*). Rizzo reportedly told the detective that he did not want to pursue charges against Merritt but would "take care of the matter on his own." (*Id.*).

Two months later, in February 2005, an anonymous letter was sent to a "Warden Dawn Hines" at IDOC asking: "How does Earl Merritt[,] a Lieutenant with the Illinois Department of Corrections[,] continue working for the state, when he is the mastermind of a criminal family

-8-

enterprise, including prostitution, bankruptcy fraud, drug sales, money laundering and many other criminal offences?" (P. Ex. 11 at 3). The envelope had typed on it the bankruptcy court's downtown Chicago return address but bore a postmark showing it had been mailed from the suburbs. (P. Ex. 11 at 1). Rizzo denied knowing who sent the letter. (Tr. at 40-41). However, it bears all the hallmarks of other Rizzo letters in the record. (*See, e.g.*, P. Exs. 1, 7-9).

To this day, Rizzo maintains that Merritt was engaged in money-laundering with Passialis and that the statement he made to Williams was true. (*See* Tr. at 24-25). Asked at trial whether it was his "belief that Mr. Merritt continues to be the mastermind of [a] criminal family enterprise," Rizzo answered: "Yeah. Him and his nephew, of course." (*Id.* at 41).

### 3. Conclusions of Law

Section 523(a) of the Bankruptcy Code excepts certain debts from the discharge granted to a debtor in section 727. 11 U.S.C. § 523. Because the goal of bankruptcy is to give the debtor a fresh start, *Local Loan Co. v. Hunt*, 292 U.S. 234, 244-45 (1934), debts are presumed dischargeable and will be discharged unless proved non-dischargeable.[8] *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996). The burden of proving an exception to discharge rests with the objecting creditor, who must demonstrate non-dischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291

---

[8]  In deciding dischargeability objections, courts routinely comment that exceptions to discharge are "construed strictly" or "construed narrowly" against objecting creditors and in favor of debtors. *See, e.g., Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002). In making this comment, courts are really just emphasizing the presumption that debts are dischargeable. There is no reason to "construe" section 523(a) unless it presents some problem of statutory interpretation. *Cf. Berkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 963 (7th Cir. 2004) (correctly invoking the concept of strict construction in favor of the debtor as a rule of statutory interpretation).

-9-

(1991); *Goulet v. Educational Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a section 523(a)(6) claim, an objecting creditor must prove three elements: (1) the debtor owes a debt resulting from an injury he caused to another entity; (2) his actions in causing the injury were willful; and (3) his actions in causing the injury were malicious. *James Cape & Sons Co. v. Bowles (In re Bowles)*, 318 B.R. 129, 146 (Bankr. E.D. Wis. 2004); *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 641 (Bankr. N.D. Ill. 2004); *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001).

The terms "willful" and "malicious" have caused no end of problems. *See Mills v. Ellerbee (In re Ellerbee)*, 177 B.R. 731, 738 (Bankr. N.D. Ga. 1995) (noting that the courts of appeals have "struggled with their meaning"). At least in this circuit and the Sixth, an act is "malicious" for purposes of section 523(a)(6) if it is done "'in conscious disregard of one's duties or without just cause or excuse.'" *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)); *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004); *Mulder*, 307 B.R. at 641. Neither ill will nor a specific intent to do harm need be shown for conduct to be "malicious." *Thirtyacre*, 36 F.3d at 700; *Trantham*, 304 B.R. at 308.

On the other hand, an act is "willful," the Supreme Court clarified in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), if both the act itself and the resulting injury – "the consequences of [the] act" – are intended. *Id.* at 61-62. It is not enough, in other words, for the debtor merely to have committed an intentional act that happened to result in an injury. The debtor must have

intended to cause the injury itself. *Gulevsky*, 362 F.3d at 964 (stating that section 523(a)(6) requires "proof that the injury was intended"); *Bowles*, 318 B.R. at 146 (noting that creditor must prove that the debtor "actually intended to harm"); *Kenna v. Lee (In re Lee)*, 304 B.R. 344, 348 (Bankr. N.D. Ill. 2004) (requiring proof that the debtor "actually intended to cause harm"). And actual intent to cause the injury is critical: a lesser mental state – negligence or recklessness – will not suffice.[2/] *Geiger*, 523 U.S. at 64 (holding that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)").

The willful and malicious standard "is a stringent one," *CMEA Title Agency, Inc. v. Little (In re Little)*, Nos. 04-21457, 05-1107, 2005 WL 3500846, at *4 (Bankr. N.D. Ohio Dec. 22, 2005), and both elements must be satisfied. Unless the injury was willful *and* malicious, the resulting debt will be discharged. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004); *Trantham*, 304 B.R. at 306.

In this case, Merritt failed to prove either element. To begin with, the evidence did not show that in accusing Merritt of involvement in a money-laundering scheme with his nephew, Rizzo's conduct was "malicious." Employing the same definition of the term that prevails in this circuit, courts in the Sixth Circuit have held that a defamatory statement is not "malicious" unless

---

[2/] Despite *Geiger*, the mental state requirement under section 523(a)(6) continues to raise questions. Some post-*Geiger* decisions hold that "willful and malicious" is a single concept, so that a finding of one necessarily entails a finding of the other. *See, e.g., Williams v. International Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003). Other decisions disagree. *See, e.g., M & I Heat Transfer Prods., Ltd. v. Gorchev (In re Gorchev)*, 275 B.R. 154, 169 (Bankr. D. Mass. 2002). Still other decisions consider a debtor to have acted willfully even in the absence of actual intent to cause injury, as long as the debtor knew there was a "substantial certainty" that injury would result. *See, e.g., Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). This group of decisions, too, is split. Some courts hold that subjective knowledge of the substantial certainty of injury is necessary. *See, e.g., id.* at 1143-46. Others hold that the test is objective. *See, e.g., Williams*, 337 F.3d at 508-09. The Seventh Circuit has not yet weighed in on any of these issues.

the debtor knew the statement was false when he made it. *See Wheeler*, 783 F.2d at 615; *Qui v. Zhou (In re Zhou)*, 331 B.R. 274, 277 (Bankr. E.D. Mich. 2005); *see also Mitan v. Davis (In re Davis)*, Nos. 03-36661, 04-3322, 2005 WL 3406752, at *10 (Bankr. W.D. Ky. Dec. 7, 2005) (dictum). Courts elsewhere have reached the same conclusion. *See, e.g., Gorchev*, 275 B.R. at 170; *Langan v. Evers (In re Evers)*, 212 B.R. 945, 949 (Bankr. E.D. Wis. 1997); *Materia v. Pereira (In re Pereira)*, 44 B.R. 248, 251 (Bankr. D. Mass. 1984). A debtor does not act in "*conscious* disregard of [his] duties," *Thirtyacre*, 36 F.3d at 700 (emphasis added), in making a defamatory statement that he actually believes is true.

Merritt failed to prove that Rizzo knew the money-laundering accusation was false. To the contrary, the evidence showed that Rizzo believed the accusation was true – and still believes it. Asked whether Merritt's attorney in the defamation action had ever asked him to retract the accusation, Rizzo answered: "He may have. But the statement was true, so I wouldn't have done it." (Tr. at 24). "So ultimately," the examination proceeded, "the bottom line is you refused to retract your statement?" "Yeah," said Rizzo, "because he was money laundering." (*Id.* at 24-25). Rizzo made clear that he continues to consider Merritt "the mastermind" of a "criminal family enterprise." (*Id.* at 41). Rizzo's testimony on this score was credible. Given his sincere (though mistaken) belief that his statement was true, Rizzo's act in making the statement was not "malicious."[10] *See Wheeler*, 783 F.2d at 615; *Zhou*, 331 B.R. at 277.

---

[10]    One reason Rizzo believed Merritt was engaged in money-laundering is that, despite his many years as a private investigator, Rizzo has no idea what "money-laundering" is. He concluded that Merritt was "laundering" the $48,450 check for Passialis because Merritt was "hiding" the check in his checking account. (Tr. at 79; *see also id.* at 78). In doing so, Rizzo said, Merritt and Passialis were "defrauding the government" because Passialis had claimed poverty in order to receive public assistance. (*Id.*) But as discussed earlier, simply hiding money is not "money-laundering"; the money must also have had an unlawful source. *See Esterman*, 324 F.3d at 569; *Fields*, 339 Ill. App. 3d at 697, 791 N.E.2d at 693.

Merritt also failed to prove that Rizzo's conduct was "willful." Rizzo made the money-laundering accusation in the process (and purely for the purpose) of collecting his judgment against Passialis. (Tr. at 20). Moreover, he did not simply volunteer the accusation. He made it in response to a question from Williams, one of Merritt's supervisors. (*Id.* at 66-67, 81-82). Rizzo testified that he had called the Valley View facility only to find out *how* to serve Merritt there, when the person with whom he was connected asked *why* he was trying to serve Merritt in the first place. Had he not been asked, Rizzo testified, he would not have answered as he did:

> If she would have said, "Come to the front door and I'll have someone meet you," I would have come to the front door or ha[d] the process server give it to her. But instead she said, "Why are you serving him and what's this about." And I had to tell her . . . . She wanted to know what this subpoena was for. I couldn't say, "I can't tell you."

(*Id.* at 82). This testimony, too, was credible. Given the circumstances under which he made the statement, then, Rizzo did not "intend[ ] to harm" Merritt in making it, defamatory though the statement plainly was.[11] See *Bowles*, 318 B.R. at 146. The statement was not "willful."

It is probably true as a general matter that Rizzo would like very much to harm Merritt.

---

[11] Although Merritt has not renewed his collateral estoppel argument, it is worth noting that in its decision the state court made no finding that Rizzo had acted with an intent to harm. (P. Ex. 4). No finding was required: defamation has no mental state element. See *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 639 (7th Cir. 2005) (listing elements). The state court's only conclusion about mental state came in awarding punitive damages because Rizzo had acted "with a reckless disregard for the truth or falsity" of the statement. (P. Ex. 4 at 4).

The state court's finding that Rizzo's statement was "defamation *per se*" adds nothing to the mental state equation. Defamation *per se* does not mean the defendant had a certain state of mind. It means his statement was a kind "so obviously and materially harmful" that injury to reputation is presumed. *Van Horne v. Muller*, 185 Ill. 2d 299, 307, 705 N.E.2d 898, 903 (1998). Proof of defamation *per se* thus relieves the plaintiff of having to prove actual damages. *Id.* Despite contrary statements in some cases, see, e.g., *Mullen v. Solber*, 271 Ill. App. 3d 442, 444, 648 N.E.2d 950, 952 (1st Dist. 1995), defamation *per se* does not imply "malice" or mean malice need not be proved. Malice never has to be proved as part of a plaintiff's *prima facie* case.

-13-

The testimony and exhibits at trial disclosed an ugly and long-standing feud between Rizzo and Passialis, one into which Merritt and his wife were drawn. Over the course of this feud, Rizzo wrote a series of abusive and threatening letters, one of them apparently anonymous, to Merritt, Merritt's attorney, and IDOC officials. The letters called Passialis an "unemployable, burned-out junkie" (P. Ex. 9) and a "career criminal" (P. Ex. 1), repeated the money-laundering accusation about Merritt (P. Exs. 1, 11), and claimed Rizzo would be spending "the next ten years or so" investigating "the Passialis family" (P. Ex. 7; *see also* P. Ex. 8). But although these letters undoubtedly evidence an overall intent to injure Merritt, they do not show that Rizzo's statement to Williams, the only statement at issue here, was made with that intent.

It is also true that Rizzo on the whole was not a credible witness. His testimony was shifting and inconsistent. He quibbled and equivocated. At times, he lied outright – denying, for example, that he had made statements clearly appearing on the face of his many letters (*see, e.g.*, Tr. at 26 (denying having ever said he intended "to investigate the Passialis family for the next 10 years")), and falsely attributing to Merritt a letter that was obviously his own (*see id.* at 36-37; Ex. 10). That Rizzo's credibility was doubtful on many matters, however, does not mean it was doubtful on all. *See In re Okon*, 310 B.R. 603, 608 (Bankr. N.D. Ill. 2004) (making this observation about a debtor's testimony). "Even scoundrels tell the truth sometimes." *Id.* His other problematic testimony aside, Rizzo's uncontradicted description of how he came to make the defamatory statement to Williams was believable.

Because Merritt failed to prove that Rizzo's defamatory statement was "willful and malicious" as section 523(a)(6) requires, judgment will be entered in favor of Rizzo and against Merritt on the complaint.

### 4. Conclusion

Judgment is entered in favor of defendant Ernie Rizzo and against plaintiff Earl Merritt on the complaint. The complaint is dismissed.

A separate Rule 9021 judgment will be entered in accordance with this opinion.

Dated: January 27, 2006

_____
A. Benjamin Goldgar
United States Bankruptcy Judge